Anderson, J.
delivered the opinion of the court.
This is a suit in equity by creditors of a firm, who sue for themselves, and all other creditors of the firm, who will come in and prove their debts, and comply with the terms, to set aside a deed as fraudulent which purports to be a conveyance by the members of the firm of all their effects, debts and choses in action, to one of the appellants.
It is a familiar and firmly established rule in courts of equity, that the allegations of a bill which are positively denied by the answer responsive thereto, to be availing must be proved by two credible witnesses, or by one witness and corroborating circumstances.
*548 The chief witness relied apon by the plaintiffs, to prove tlje allegations of the bill, is Wm. J. Gentry, a member ^ie fr™3’ aQd a party to the suit. It does not appear from the record, that he has any interest in the controversy other than a desire that the assets of the firm should be honestly applied to the payment of its debts.
But it is objected, if there was fraud he participated in it—was a confederate in the fraud, and should not be allowed to set up his own fraud as a means of destroying the title which he passed by his bill of sale. But it is not the witness who sets up the fraud to invalidate his deed. It is a third party, who had no participation in the fraud; an innocent creditor, who alleges that the deed was executed to the prejudice of his rights, who sets up the fraud, and introduces the witness to prove it. And if he were a confederate in the fraud he would be a competent witness, for the creditor, to prove the fraud.
But it is contended that the principle nemo audiendus esi allegans mam turpitudinem, would exclude him. If that be law at this day, which is not conceded, the deposition of the witness alleges no turpitude in himself, in his connection with the transaction. On the contrary, he represents, that he himself was deceived and made a victim of the fraud.
E"either Brown nor Sawyer, the partner of Gentry, deny or affirm, in their answers, what Gentry avers in his answer, and more fully and particularly proves in his deposition, that Brown agreed to advance for his friend Sawyer his part of the capital, from $2,500 to $8,000 ; in consideration of which promise, Gentry agreed to take him into partnership ; and that the sums entered to Brown’s credit on the books of the firm, by Sawyer; who had charge and control of the books, were in fact advances made by Brown for Sawyer, in pursuance of that agreement. These facts are fully proved by Gentry, and are no where denied, or disproved, in the record. And the commissioner, to whom the matters were re *549 ferred by an order of reference in the Circuit court, in his report, responsive to the first inquiry submitted to him by the court, stated, “-that ¥m. J. Gentry and Byron L. Sawyer, were equal partners in the firm of ¥m. J. Gentry & Co.; and that the funds and credit, furnished by A. Vance Brown, were furnished as and for the interest of Byron L. Sawyer, in the said concern of Wm. J. Gentry & Co.” To this part of the report, no exception was taken ; and it was confirmed by the court.
This then must be regarded as an established fact in the cause. And what does it show ? Why that Gentry, when he agreed to secure Brown, as he says was the purpose of the deed, assumed and secured a debt for which he nor his firm were liable. What was the inducement to this act ? What was the consideration of this assumption ? Sane men cannot be presumed to assume large pecuniary liabilities without some consideration. ■
The bill alleges that the consideration was, that further advances would be made to the firm by Brown. Brown in his answer denies that he made such a promise. The answer of Sawyer makes no express allusion to this particular allegation of the bill, or denial of it. It is proved by the witness, Wm. J. Gentry, that he was willing that the firm should become bound to pay the debts of Sawyer to Brown, in consideration of the promise that Brown made, as Mr. Sawyer informed him, that he would endorse the paper of the firm, for their future accommodation. He says he expected then that Mr. Brown would endorse a note for twenty odd hundred dollars, which they needed to pay accruing indebtedness. “ The money wras soon due. We were hard up (he says) and under the pressure of our creditors. I was willing to secure Mr. Brown, as above stated, if he would furnish us with the accommodation that we required. I expected him to endorse other notes for us, as we needed them.” He here assigns a reason for agreeing to secure *550 a debt to Brown, for which neither he nor the firm were hable, by pledging the effects of the firm for its payment. ^as ^ *ke ^rue m°tive and consideration ? "What other motive could he have had ? The appellants show none. The record assigns no other. It is not probable that he would have performed such an act without motive. And the situation of his affairs, and the condition of his firm, made it .necessary that he should have such aid and endorsation. It is therefore inconceivable that, but for this assurance, Gentry would have consented that his firm should become liable for Brown’s debt, and that the effects of the firm should be pledged for its payment. The allegation of the bill, proved by the testimony of this witness, supported by these corroborating circumstances, must be taken to be true, notwithstanding the denial of the answers.
If it be true, as alleged by Brown in his answer, that he did not procure the execution of the bill of sale, and made no representation, or promise, in respect to the same, and further, that he never agreed to make further advances to the firm of Gentry & Co., in consideration of their executing the deed aforesaid, he may not have intended that this denial should have reference to the promise previously made through Sawyer, when no such deed was contemplated, at least by him. Be that as it may, if he kept aloof and did not actively participate in the fraud ; if he remained a passive spectator, while Sawyer and Freedly concocted and carried out the scheme to swindle Gentry aud defraud the creditors of Gentry & Go., and only received the fruits of the fraud, he cannot escape its consequences. If he did not undertake to make further advances to the firm, or to endorse their accommodation paper to enable them to meet their liabilities in consideration of their assumption to pay his debt, then the deed is voluntary without valuable consideration, and under the statute is fraudulent as to creditors. He says he received the notes of Freedly, which were *551 given to Gentry & Co. in consideration of the deed. He says it was proposed by ¥m. J. Gentry & Co. (not ¥m. J. Gentry), to give him the notes of Samuel Freedly at thirty and sixty days, for the amount of his debt; which he accepted : and that he had disposed of them. He does not say in what way. But as the notes were given for the sum chiefly, which he had donated to his friend Sawyer as his input in the firm of Gentry & Co., it might be inferred that he had disposed of said notes by turning them over to Sawyer as his own. In this way he would be enabled to withdraw his input capital from the firm of Gentry & Co., and carry it with him to a distant State ; leaving the balance of the effects in the hands of his confederate, Freedly, with which to pay himself for the part he performed in the transaction ; and leaving his credulous and confiding partner, who does not seem to be a man of much penetration or discretion, now amazed and astounded with the strange result of his financial, operation, which he probably had regarded as a very ingenious financial conception, “ to try (as coolly advised by his retreating partner), to effect an honorable settlement with the balance of our creditors.” Great was Gentry’s amazement and chagrin, when he returned from the country, to find his cherished financial conception exploded, his means and effects spirited away out of his hands, himself ejected from his own premises, except as a hireling, absolutely stripped of every thing, and a stranger installed in his place of business. Such perturbation and amazement was the natural result of the assurance he felt, when he executed the deed, that he would be able to maintain his credit by Brown endorsing for the accommodation of the firm, and that their business would go on. This then must be regarded as another established fact in the cause, that such was his inducement to execute the deed.
Auother fact is alleged by the bill, to wit: that the deed was intended to be a mortgage or deed of trust, to *552 secure Brown’s debt, and not an absolute sale to Freedlv, This allegation is denied by the answers. But it would: seem a necessary corollary from the position just established. If the inducement to the assumption of Brown’s debt by the firm, was that the firm might meet its liabilities, maintain its credit, and continue its business by the future advances of Brown, or by his endorsing their accommodation paper, the said deed could not have been bona fide intended to be what its face purports, an absolute sale. Brown’s denial is more guarded than the others. He only denies all “ knowledge” that it was so intended; and that so far as he knows the allegation is not true. But the denial of Sawyer is bold and unqualified. He says the pretence set up by Gentry, “that it was understood by him, that it was a deed of trust or mortgage, and not a bill of sale, is simply and wholly false, and well known by Gentry so to be ; it was perfectly understood to be, what it purported to be, an absolute bill of sale, and not a deed of trust or mortgage.” How can this answer be reconciled with his letter to Gentry of the 20th of December, from New York, in answer to Gentry’s of the 12th ; which they have not thought proper to produce. In this letter he says, “We were heavily in debt, with no prospect of ever paying it, and continually running behind. Consequently the best thing that could be done, was to make Mr. B. whole, and try to effect an honorable settlement with the balance of our creditors; and to do this we adopted the above system.” I can give no other meaning to that language than that the conveyance to Freeclly was to. secure Brown. First make him whole, and then to. settle honorably with the balance of the creditors. But Freedly, Sawyer and Brown took all, and left nothing; to settle honorably with the creditors.
The answers cannot be read as evidence for or against either party. Their affirmative statements are not proved by any evidence in the cause. The allegation *553 now under consideration, is proved by the direct testimony of Gentry; and that is strongly corroborated by this letter, and by the conclusive presumption, arising from the consideration upon which he consented that the firm should become liable for Brown’s debt; and affirmative statements of Freedly, to the effect that the sale was negotiated with him by Sawyer, tend rather to strenghten this conclusion than to throw doubt upon it. It was Sawyer who proposed to sell him the goods. It was Sawyer with whom he made the agreement. It was Sawyer who took his notes at thirty and sixty days. It was Sawyer who received the notes, and transferred them to A. Vance Brown. It was Sawyer who executed to him a receipt for the whole pretended price of the goods. Of all which transactions, Gentry was kept in total ignorance; the idea being held out to him, all the while, that he was only to give a pledge of the goods as a security for Browu’s debt; in consideration of which Brown would continue to endorse for them, and enable them to meet their liabilities, and to go on with their business. And when he expressed surprise that the deed was made to Freedly, he was artfully told, that it was-because Mr. Brown didn’t wish his name to appear in-the matter, as it might injure him in bank.
It is possible that Freedly may have been himself deceived by Sawyer, and have been made by him a blind-instrument in the perpetration of this impudent and nefarious fraud upon Gentry and the creditors of his-firm. But the facts in the cause, tending to show his-complicity, will not admit of that charitable supposition. It is positively alleged in the bill, that the debt of Brown,, as shown by the books, was $2,617.47, and not $8,826.76, as claimed by the appellants. The answers deny that the debt was only $2,617.47, but they produce no evidence to show that it was more. Freedly had possession of the books, and if the testimony of Gentry to this fact were not true, it ©ould have been *554 shown hy producing the books. But he does not produce them, or show any reason why he did not produce them. This fact must then be taken as true, that this was a contrivance not only to withdraw the social effects fr°m the payment of the debts of the firm, and to approPT"ia,te them to refund the input capital of one of the firm, but for a much larger amount than he had actually put in.
The bill alleges, that- the effects of the firm embraced in the deed were of the value of about $9,000. The proof by Gentry is that they were worth between eight and nine thousand dollars, near nine, at first cost, according to the inventories or invoices. Freedly took possession of all the books and papers of the concern; yet he does not produce these papers in evidence, or account for their non-production. The answers deny that the goods were worth so much ; but no proof is introduced by the appellants, to prove that they were not worth so much, as Gentry testifies they were worth ; and the presumption arising from the non-production of the inventories, corroborates his testimony, and supports the allegation of the bill. The inference is, that the price which Freedly alleges he agreed to pay for the goods, is very inadequate, and is an indicium of fraud,
t But the contract, as alleged, is inconsistent with the idea of a sale and purchase. He professes to have purchased a stock of goods, which are proved to be worth between eight and nine thousand dollars, without taking any inventory, and the store fixtures and furniture, debts and choses in action of the concern, for the precise sum of three thousand eight hundred and twenty six dollars and seventy-six cents. If his contract had been to purchase the goods at cost, or at such a per cent, above or under cost, and the furniture at an estimated price, and the choses in action estimated at so much, and upon an inventory taken they summed up those precise figures, it would not be incompatible with the idea of a sale and *555 purchase. But that was not the case. This is claimed to be what is called a lumping contract; and if so, and if it was a purchase, a valuation must have been made of the property ; and being a lumping contract, it would have been fixed at a round sum. The price assumed by Freedly to pay, is the precise sum claimed by Brown to be due him, and tends to show that no valuation was made of the property (without which there could not be a sale and purchase), but that the effects of the concern were transferred to Freedly to pay that debt. And he, claiming the absolute title to the property as by a sale, in which no attempt was made to ascertain its value, is another indicium of fraud. Indeed, the whole complexion of the case is such, and Freedly, Sawyer and Brown are so mixed up in the transaction, that it is not easy to resist the conclusion of a confederation. That Freedly could have been the active instrument in carrying out this palpable fraud, and in the way in which it was carried out, and so as to conceal all knowledge of their purpose from the chief partner, without being privy to it, is incredible. Ve are of opinion, therefore, that the said bill or deed of sale from ¥m. J. Gentry and Byron L. Sawyer, to Samuel Freedly, is fraudulent and void; and that the decree of the Circuit court must be affirmed.
Decree affirmed.